**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | | |
|---|---|---|
| SEAN DALE HENRY, GUN OWNERS OF AMERICA, INC., and GUN OWNERS FOUNDATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| HONORABLE MARIO BROOKS, in his Official Capacity as COMMISSIONER OF THE VIRGIN ISLANDS POLICE DEPARTMENT, and the GOVERNMENT OF THE VIRGIN ISLANDS, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Sean Dale Henry, Gun Owners of America, Inc., and Gun Owners Foundation ("Plaintiffs"), by and through undersigned counsel, and allege as follows:

1.      This case involves a challenge to the United States Virgin Islands' ("USVI") wholesale refusal to allow Americans to exercise their enumerated constitutional right to "keep and bear Arms" unless they have a "bona fide residence or place of business" in the USVI.

2.      The Second Amendment applies to the USVI. *See* 48 U.S.C. § 1561 ("the first to ninth amendments inclusive … are hereby extended to the Virgin Islands"); *Williams v. Bellot*, 70 V.I. 38, 66 (Super. Ct. 2019) ("Congress extended the Second Amendment to the Virgin Islands"). Likewise, the second sentence of the Fourteenth Amendment to the United States Constitution[1]

_____

[1] "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property,

1

applies to the USVI with "the same force and effect there as in the United States or in any State of the United States...." Revised Organic Act of 1954, § 3.

3.      In *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Supreme Court explained that the Second Amendment "is exercised individually and belongs to all Americans." And in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the Court unambiguously held that this "guarantee[]" includes "a right to 'bear' arms in public for self-defense."

4.      In direct contravention of those clear holdings, the USVI provides no avenue for "all Americans" – who are not residents of the USVI – to keep or bear arms.

5.      First, the USVI generally bans the bearing of arms for nonresidents as a general matter, even if licensed to carry by another jurisdiction. *See* 23 V.I.C. § 452. Shortly after *Bruen* recognized a broad, textual and historical right to public carry, the USVI *repealed* its then-existing statute that had granted limited concealed carry reciprocity to the firearm license holders of other states. *See* 2022 V.I. SESS. LAWS 8586. Thus, as of 2022, the USVI does not recognize the firearm licenses issued by any state or territory. And, because the USVI also prohibits the "open carry" of firearms (14 V.I.C. § 2253), there is no way for nonresidents to "bear arms" in public based on reciprocity.

6.      Nor does USVI law allow nonresidents to apply for a USVI license to carry. USVI law enumerates five categories of "[p]ersons who may be licensed to carry firearms." 23 V.I.C. § 454. Those include employees of the government and certain businesses, individuals "having a bona fide residence or place of business within the Virgin Islands," and, "[w]ith respect to a rifle or a shotgun," individuals "possessing a valid and current Virgin Islands hunting license." *Id.*

---

without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

7.      Thus, although nonresidents ostensibly may obtain a USVI hunting license,[2] such license only applies to long guns and does not authorize the public carry of *handguns*,[3] the "most popular weapon chosen by Americans for self-defense" and whose "complete prohibition … is invalid." *Heller*, 554 U.S. at 629.

8.      Making matters worse, the USVI generally bans even the *keeping* of arms by nonresidents and residents alike.  In the USVI, government permission is required for any person merely to possess firearms.[4]  And unless a person has a "bona fide residence or place of business within the Virgin Islands" or "holds a current and valid license to hunt in the Virgin Islands," such person may not even apply for a license.  *See* 23 V.I.C. § 454(3).  This means that such persons cannot even "keep … Arms" within a private domicile or on private property, as a general matter.

9.      Thus, for the 99.975 percent of Americans who are not residents[5] of the USVI, Second Amendment rights simply do not exist on the islands.  No other provision of the Bill of Rights works this way.  *See Heller*, 554 U.S. at 634 (rejecting Justice Breyer's opinion that the Second Amendment should be interpreted differently when "limited to an urban area," explaining

---

[2] *See* 23 V.I.C. § 456(a)(2) (contemplating "a nonresident who holds a current and valid license to hunt in the Virgin Islands").

[3] *See* 23 V.I.C. § 454a (establishing the "license to carry a concealed handgun on 24-hour basis").

[4] The USVI requires some form of license, subject to in-state residency or place-of-business requirements, to possess any "firearm or electric weapon...."  23 V.I.C. § 454; *see also* 14 V.I.C. § 2253 ("Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm, as defined in Title 23, section 451(f) of this code, loaded or unloaded, may be arrested without a warrant, and shall be sentenced to imprisonment of not less than ten years and shall be fined not less than $10,000 nor more than $15,000 or both the fine and imprisonment....").  This catastrophically harsh punishment – merely for exercising an enumerated constitutional right – exceeds even unlawful possession of a machinegun, in violation of 18 U.S.C. § 922(o), which carries a maximum of 10 years' imprisonment.  *See* 18 U.S.C. § 924(a)(2).

[5] Plaintiffs use the shorthand "nonresident" to mean a person who is not a resident of the USVI, does not own a business in the USVI, does not own property in the USVI, and does not maintain a hunting permit in the USVI.

that "[w]e know of no other enumerated constitutional right [that] has been subjected to [such an] approach"). In *Bruen*, the Supreme Court criticized as intolerable an argument that "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense...." *Bruen*, 597 U.S. at 31. Yet for nonresidents of the USVI, *the entire territory* is exempted from the Second Amendment.

10. The USVI's patently unconstitutional scheme of denying Second Amendment rights to nonresidents represents an extreme outlier in the United States, as Plaintiffs are not aware of any state that similarly has *no mechanism* for nonresidents to keep *or* bear arms – by denying nonresidents the ability to apply for licenses to carry a concealed handgun, by refusing to recognize or grant reciprocity to the out-of-state licenses held by nonresidents, and by conditioning mere possession (much less carry) of all firearms on the issuance of an unobtainable government permission slip.[6]

11. Unsurprisingly, other courts have struck down even less restrictive firearm regimes. Rejecting California's refusal to issue nonresident permits, a district court in California held that a law "barring nonresidents from applying for [concealed carry] licenses violate[d] the Constitution." *Hoffman v. Bonta*, 789 F. Supp. 3d 995, 1004 (S.D. Cal. 2025); *see also Higbie v. James*, 795 F. Supp. 3d 307, 342-43 (N.D.N.Y. 2025) (citation omitted) ("Plaintiffs have the 'general right to publicly carry arms for self-defense' outside the home which, during an individual's daily life, can include crossing state lines. Defendant … has not presented any reason

---

[6] In contrast, although Connecticut, for example, refuses to recognize other states' carry licenses, it allows nonresidents to apply for Connecticut Pistol Permits, should they wish to carry firearms in Connecticut, provided they already have a license to carry from another state. *See* Conn. G.S. § 29-28(f). Even Hawaii, which has not issued licenses to nonresidents, still allows nonresident visitors to transport firearms within the state. *See* H.R.S. § 134-3.

why Plaintiffs' constitutional right to keep and bear arms should stop at the State line."); *Solinsky v. Lopez*, No. 1:26-cv-00117-JAO-RT (D. Haw. Apr. 15, 2026), ECF No. 19 (Stipulated Permanent Injunction enjoining "HRS § 134-9(a)(5) … to the extent that it prohibits non-residents of the State of Hawai'i from obtaining a license to carry a pistol or revolver and ammunition concealed on the individual's person on the basis of their residency").

12. Finally, a Massachusetts court recently opined that "[a] law-abiding resident of [one state] who is exercising his Constitutional right should not become a felon by exercising that right while he is traveling through [another state] merely because he has not obtained [that state's] license to carry.... This Court can think of no other constitutional right which a person loses simply by traveling beyond his home state's border into another state continuing to exercise that right and instantaneously becomes a felon...." *Commonwealth v. Donnell*, No. 2211CR2835, 2023 Mass. Super. LEXIS 666, at *8-9 (Aug. 3, 2023), *aff'd*, 252 N.E.3d 475 (Mass. 2025), *abrogated on other grounds*, *Commonwealth v. Rodriguez*, 267 N.E.3d 77, 92 n.8 (Mass. 2025).

13. This Court similarly should strike the USVI's Second Amendment ban for 99.975 percent of Americans.

## I.    PARTIES

14. Plaintiff Sean Dale Henry is a natural person and a citizen of the United States and of the State of Florida. Mr. Henry resides in Gilchrist County, Florida. *See* Exhibit A, Declaration of Sean Dale Henry.

15. Mr. Henry is a law-abiding person, a gun owner, and he currently possesses a Florida Concealed Weapon License that allows him to bear arms in public not only in Florida but also across much of the United States. Mr. Henry also maintains a Federal Firearms License

5

("FFL") issued by the federal government.  Mr. Henry is a member of Plaintiff Gun Owners of America, Inc. and a supporter of Plaintiff Gun Owners Foundation.

16.     If allowed to apply for a USVI license to carry a concealed handgun, Mr. Henry would do so immediately.   However, he is prohibited even from applying because he is a nonresident of the USVI.  Were he allowed to apply for a license, Mr. Henry would meet the eligibility standards required for such a license, aside from his nonresidency.  But for the prohibition on his applying by virtue of his out-of-state residency, Mr. Henry is otherwise eligible to possess and carry firearms in the USVI.

17.     Similarly, if allowed to use his Florida Concealed Weapon License to possess and carry firearms within the USVI, Plaintiff Henry would do so, but cannot due to operation of USVI law which does not recognize the validity of his Florida license – or any state's license, for that matter.

18.     Plaintiff Henry is the kind of person discussed by the Supreme Court in its recent opinion in *Bruen* – that is, he is a typical, law-abiding American citizen with ordinary self-defense needs, who cannot be dispossessed of his right to bear arms in public for self-defense in the United States Virgin Islands simply due to his nonresident status.

19.     While generally "a plaintiff must submit to a government policy in order to have standing to challenge that policy," *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 308 (D.N.J. 2022) (citing *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997)), that standard does not apply when "the failure to apply formally for a benefit or opportunity will not preclude standing if application would be futile." *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021).

6

20.     Here, Plaintiff Henry is ready and able to apply for a license to carry a concealed handgun in the USVI, meeting all the requirements of Chapter 5 of Title 23, with the exception of nonresidency.  In other words, Plaintiff Henry is statutorily unable to apply for a license to carry a concealed handgun, but would be able to apply immediately if the residency requirements were struck down.

21.     But even though it is clear that Plaintiff Henry is not eligible to apply for a license to possess and carry firearms within the USVI, Plaintiff Henry has taken steps to apply in any event.  To that end, Plaintiff Henry called the USVI Police Department, multiple times, and at multiple numbers posted on the USVI Police Department's website.  But these attempts to reach USVI officials have been to no avail.  *See* Exhibit A, Declaration of Sean Dale Henry.  In fact, Mr. Henry has been unable to get the USVI police to so much as pick up the telephone.

22.     The fact that the USVI police do not answer their phone makes Plaintiff's need to keep and bear arms for his own self-defense all the more vital.

23.     On October 13, 2025, Mr. Henry contacted the USVI Police Department, Office of Police Commissioner at (340) 715-5506.  There was no answer and no way for Mr. Henry to leave a message.

24.     Thinking that the office may be closed due to the Columbus Day federal holiday, Mr. Henry tried again the next day.  On October 14, 2025, Mr. Henry called the same number, but again, there was no answer and no way for Mr. Henry to leave a message.

25.     On that same day, Mr. Henry made a third phone call to the main number on the USVI Police Department's website: (340) 776-9110.[7]  This number returned a message that it was "not in service."

---

[7] *See* https://vipd.vi.gov/contact-us/.

26.    That same day, Mr. Henry placed a fourth phone call to another number he found online for the USVI police: (340) 715-5221.  However, that number also was not in service.

27.    Mr. Henry then contacted the USVI Office of the Police Chief at (340) 715-5548. Upon automatic answering, this line returned a message that it was "unavailable."

28.    Despite these repeated attempts, Mr. Henry has been unable to contact anyone at the USVI Police Department to obtain an application for a nonresident license to possess or carry a firearm.  Of course, constitutional rights do not rise or fall with the proper operation of a government telephone number.

29.    Thus, due to (i) the operation of USVI law and (ii) the inaction of the USVI police, there is no avenue for Mr. Henry to apply for and to receive a license to carry a concealed handgun in the USVI because he is a nonresident.

30.    Mr. Henry plans to visit the USVI within the next 90 days and then after that, would visit the USVI again within 120 days.  But for the challenged statutes, he would bring, possess, and carry a handgun concealed during his stays in the USVI, for self-defense purposes.  But for the challenged statutes, Mr. Henry would check his firearm with checked luggage at his originating airport, consistent with state and federal laws and regulations, and subsequently declare his firearm and ammunition upon landing at the USVI Cyril E. King Airport to the appropriate authority, showing his Florida Concealed Weapon License.  Mr. Henry is ready to otherwise comply with all other USVI laws regarding possession and carry of a firearm while there.

31.    However, USVI law prohibits Mr. Henry from taking this constitutionally protected course of action, on pain of ten years' – *minimum* – imprisonment.  Again, if Mr. Henry were able to apply for a license to carry a concealed handgun in the USVI, he would do so.  And were he not statutorily ineligible, he would be issued a license and would be able to carry his handgun when

8

he visits the USVI. Likewise, if the USVI accepted his Florida Concealed Weapon License as a valid substitute for a USVI license, Mr. Henry would be able to carry his handgun while in the USVI. *See* Exhibit A, Declaration of Sean Dale Henry.

32.    Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business in Springfield, Virginia. GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including within the United States Virgin Islands. Many of GOA's members, like Plaintiff Henry, are law-abiding citizens of the United States, but nonresidents of the USVI, who wish to apply for and receive a license to carry a handgun while traveling to the USVI, or otherwise to have their currently issued licenses be recognized by the USVI. Consequently, GOA members and supporters like Plaintiff Henry have been, are being, and will continue to be irreparably harmed by the USVI's blatantly unlawful contravention of their Second and Fourteenth Amendment rights. *See* Exhibit B, Declaration of Erich M. Pratt.

33.    Plaintiff Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia. GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code. Although not a "traditional" membership organization, GOF possesses "indicia of membership" under *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977), for purposes of representing its supporters' interests in litigation. *See, e.g.*, *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024). GOF is financially supported by gun owners across the country, including by two of its

9

board members, and from contributions received from individuals through the Combined Federal Campaign, all of whom receive updates about GOF's activities and fund the organization's activities so that it can, *inter alia*, file litigation such as this to preserve, protect, and defend their right to keep and bear arms. GOF brings this action on behalf of its supporters, who intend and desire to exercise their Second Amendment right to publicly carry handguns for self-defense in the USVI, but who cannot by virtue of their USVI nonresidency. These GOF supporters would carry handguns in the USVI but for their reasonable fear of prosecution. *See* Exhibit B, Declaration of Erich M. Pratt.

34.    Defendant Mario Brooks ("Commissioner Brooks") is the sitting Commissioner of the Virgin Islands Police Department ("VIPD"), an executive department of the Government of the Virgin Islands. Among other duties, Commissioner Brooks is tasked by law with enforcing the provisions governing firearms contained in Title 23, Chapter 5, Virgin Islands Code, Sections 451 through 489a, including the licensure of persons to possess and carry firearms in the Territory. Defendant Brooks may be served at USVI Police Department, c/o Sherri E. Lewis, Esq., 5400 Veterans Drive, Alexander A. Farrelly Justice Center, St. Thomas, VI 00802.

35.    By operation of USVI law, Commissioner Brooks "shall not issue a license for firearms" to Plaintiffs, by virtue of their ineligibility under "section 454 of this chapter...." 23 V.I.C. § 456(a).

36.    Defendant Government of the Virgin Islands is the governing body for the United States Virgin Islands created by the United States Congress in the Revised Organic Act of the Virgin Islands of 1954, as amended ("ROA"). Defendant Government of the Virgin Islands may be served by serving The Honorable Albert Bryan, Jr., Governor of the Virgin Islands of the United States, c/o Richard Evangelista, Chief Legal Counsel, 5047 (21-22) Kongens Gade, St. Thomas,

10

VI 00802 and The Honorable Gordon C. Rhea, Attorney General of the USVI, Department of Justice, GERS Buildings, 2nd Floor, 3438 Kronprindsens Gade, St. Thomas, VI 00802.  The USVI enjoys no Eleventh Amendment immunity from suit.  *Tonder v. M/V the "Burkholder,"* 630 F. Supp. 691, 694 (D.V.I. 1986).

## II.    JURISDICTION AND VENUE

37.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

38.    Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.    STATEMENT OF FACTS

### a. The Second Amendment.

39.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

40.    In its landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia.  *Id.* at 581.  Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation.  *Id.* at 592.

41.    Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment.  *Id.* at 791.

11

42.    Next, in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411 (per curiam).

43.    As the Supreme Court explained in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Id.* at 10.

44.    Finally, the Supreme Court's latest pronouncement on the Second Amendment reaffirms the textual and historical framework from *Heller* and *Bruen. See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen* reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*").

45.    Importantly, in addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry," *Bruen* also rejected outright the methodology previously used within this Circuit and other circuits to judge Second Amendment challenges. *Bruen*, 597 U.S. at 38 n.9; *see Range v. Att'y Gen. U.S.,* 124 F.4th 218, 225 (3d Cir. 2024) (acknowledging abrogation of Third Circuit precedent and the prior two-step methodology).

46.    Prior to *Bruen*, the Third Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. … If it does, we evaluate the law under

some form of means-end scrutiny." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *see also Bruen*, 597 U.S. at 19 n.4 (collecting cases using two-part test).

47.    Rejecting this widespread atextual, "judge-empowering" interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first principles:  to assess the text of the Second Amendment, informed by the historical tradition. *Bruen*, 597 U.S. at 19, 22.

48.    First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, reiterating that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

49.    Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Bruen*, 597 U.S. at 17; *see also Range*, 124 F.4th at 225 (government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms").

50.    Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition. *Bruen*, 597 U.S. at 37.  Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter that

text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public); *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("the constitutional right to keep and bear arms should be understood according to its public meaning in 1791").

51.     In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "Arm," then the ability to do so "shall not be infringed." Period. There are no "ifs, ands, or buts," and it does not matter (even a little bit) how important, significant, compelling, or overriding the government's interest is in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 46-47.

52.     In addition to providing the proper methodology and focal point for historical review, the Supreme Court also has instructed as to the scope of the protected persons, conduct, and arms covered by the Second Amendment.

53.     **First, the people.** *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* cited to *United*

*States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans.").

54.    Thus, as the Third Circuit recently explained, "[t]he Second Amendment's reference to 'the people' covers all adult Americans," and the term "cast[s] a wide net" to include even felons as a presumptive matter. *Lara*, 125 F.4th at 435, 436. Nowhere does the Second Amendment's plain text condition the right on in-state residency.

55.    **Second, the protected conduct.** In its analysis, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581. The Court explained that "'[k]eep arms'" was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583. Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id. Bruen*, in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, 597 U.S. at 32.

56.    **Third, the protected arms.** With respect to the term "Arms," the Court explained that such term includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and at the Founding, "all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. Thus, because not only those items and activities in "existence in the 18th century are protected" by the Constitution, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the

15

founding," *id.* at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

57.    The *Bruen* Court also acknowledged the inherent risk in *all* permitting schemes, noting that, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9 (emphasis added).

58.    Because USVI law operates to entirely deprive nonresident Americans of Second Amendment rights, this Court's intervention is necessary to make it clear to the USVI that it is not free to thumb its nose at the text of the Second Amendment or the opinions of the Supreme Court. To the contrary, the Second Amendment is neither a "constitutional orphan" nor a "second-class right." *Silvester v. Becerra*, 583 U.S. 1139, 1149 (2018) (Thomas, J., dissenting from denial of certiorari); *McDonald*, 561 U.S. at 780; *Bruen*, 597 U.S. at 70.

### b. The USVI's Unconstitutional Gun Control Regime.

59.    The USVI requires an individual to be licensed in order to possess or carry a firearm. *See* 23 V.I.C. §§ 454, 454a.

60.    As part of this scheme, the USVI requires, among other things, that the applicant be 21 years of age and demonstrate proof of firearm training (23 V.I.C. § 454a(a)), pay an "initial fee" of $75.00 (*id.* § 455(b)), and be "a resident of the Virgin Islands … or a nonresident who holds a current and valid license to hunt in the Virgin Islands." *Id.* § 456(a)(2). However, a USVI

16

hunting license appears to apply only "[w]ith respect to a rifle or a shotgun," *id.* § 454(5), and does not render a nonresident eligible to subsequently apply for a license to publicly carry a handgun for self-defense.

61.     That is certainly how it applies in practice.  Indeed, Defendants' pattern or practice is to condition issuance of a "license to carry a concealed handgun on 24-hour basis" on USVI residency.  23 V.I.C. § 454a(a).

62.     Thus, following enactment of the USVI's "*Bruen* response bill," nonresidents have no means of legally carrying a concealed handgun while visiting the islands.  Indeed, rather than bringing the Territory's statutory scheme into *compliance* with the *Bruen* decision, the Legislature of the Virgin Islands thumbed its nose at the Supreme Court and instead *repealed* the Territory's public carry reciprocity law.  *See* 2022 V.I. Bill 34-0206.  This law previously recognized the state-issued licenses of those who were a "visitor or transient resident" of the USVI.

63.     But now, 23 V.I.C. § 460 protects only *law enforcement* "while travelling through or in the Virgin Islands on official business...."

64.     The USVI firearm licensing scheme thus represents an extreme outlier within the United States, first by conditioning mere possession of a firearm on issuance of a license; second by refusing to allow nonresidents to apply for a license to carry a handgun (at least 29 states do not even require a license to carry a concealed firearm in public, while the vast majority that do require licenses issue them to out-of-state residents, and most states that require a license for concealed carry still allow open carry without a license);[8] and, third, by not accepting or recognizing the licenses issued by any other states (virtually all states recognize at least some licenses issued by other states).

---

[8] http://tinyurl.com/28axkx44.

65.     Thus, for an out-of-state individual who is not a bona fide resident or does not have a place of business within the Virgin Islands, such individual cannot even apply for a license to carry a concealed handgun to exercise their Second Amendment rights at all.

66.     Because Plaintiffs are members of "the people" who wish to "keep and bear Arms" in public, *Bruen* requires that Defendants demonstrate a broad and enduring Founding-era historical tradition of completely disarming American citizens who merely happened to be residents of another state.  *But see Donnell*, 2023 Mass. Super. LEXIS 666, at *5 (finding "no historical precedent limiting the reach of one's exercise to a federal constitutional right to only within that resident's states borders"); *see also Higbie*, 795 F. Supp. 3d at 342-43 (citation omitted) ("Plaintiffs have the 'general right to publicly carry arms for self-defense' outside the home which, during an individual's daily life, can include crossing state lines.  Defendant … has not presented any reason why Plaintiffs' constitutional right to keep and bear arms should stop at the State line."); *Hoffman*, 789 F. Supp. 3d at 1004 ("The provisions barring nonresidents from applying for CCW licenses violate the Constitution.").

67.     No such tradition has ever existed, and thus the challenged statutes infringe rights that "shall not be infringed" and must be struck down.

**COUNT I**
**U.S. CONST. AMEND. II**
**RIGHT TO KEEP AND BEAR ARMS**
**42 U.S.C. § 1983**

68.     The foregoing allegations are repeated and realleged as if fully set forth herein.

69.     The United States Virgin Islands' refusal to allow nonresidents to keep and bear arms violates Plaintiffs' Second Amendment rights that "shall not be infringed."

70.     Plaintiffs are or represent members of "the people" who desire to "bear" a quintessential protected "Arm" (a handgun) in public.

18

71.     Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.

72.     Thus, the burden is on Defendants to prove, based on Founding-era historical tradition, that their refusal to permit 99.975 percent of Americans to keep or bear arms in the USVI somehow comports with the original public understanding of the Second Amendment.

73.     However, there is no historical analogue for requiring individuals to apply for a license to carry a concealed handgun prior to carrying a firearm in public (much less even possessing or "keep[ing]" a firearm), and certainly no historical analogue for limiting carry solely to those residents of a particular state.

74.     Thus, 23 V.I.C. § 454, 23 V.I.C. § 454a, and 23 V.I.C. § 456's residency or place-of-business requirement, along with any regulations purporting to implement either of those requirements, violate the Second Amendment and conflict with *Bruen*'s clear teachings.

75.     As such, Defendants' laws, customs, practices, and policies, reducing the Second Amendment's protection of the right to "keep and bear arms" to an inkblot, damage Plaintiffs in violation of 42 U.S.C. § 1983.

76.     By infringing the Second Amendment right to bear arms in public in these ways, the USVI's laws and regulations discussed in the foregoing allegations violate the Second Amendment, which apply to Defendants by operation of the Fourteenth Amendment and ROA § 3, both facially and as applied to Plaintiffs, and are therefore invalid.

### PRAYER FOR RELIEF

19

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. An order declaring that the challenged sections of 23 V.I.C. § 454, 23 V.I.C. § 454a, 23 V.I.C. § 456, and 14 V.I.C. § 2253, and any other regulation or law that precludes the issuance of licenses to carry handguns to nonresidents are unenforceable, unconstitutional, and violate the Second and Fourteenth Amendments to the United States Constitution;

2. An order declaring that the USVI must allow nonresidents to apply for and be issued licenses to carry a concealed handgun in the USVI;

3. An order permanently enjoining all Defendants and all other officers, agents, servants, employees, and persons under the authority of the Territory from refusing to accept applications from, and refusing to issue licenses to carry a concealed handgun to, otherwise-eligible persons who are nonresidents of the USVI;

4. Nominal damages;

5. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

6. Such other and further relief as is necessary to effectuate the Court's judgment or that the Court otherwise deems just and appropriate.

Dated: July 20, 2026                                  Respectfully Submitted:


*/s/ Kyle R. Waldner*
Kyle R. Waldner, Esq.
kwaldner@wlawvi.com
V.I. Bar No.: 1038
Waldner Law, P.C.
1026 Norre Gade (mailing)
24b Norre Gade (physical)
St. Thomas, VI 00802

*Counsel for Plaintiffs*

20